<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> KENNETH STRICKLAND, <br><br> Defendant. | Case No. 2:21-cr-311 (BRM) <br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendant Kenneth Strickland's ("Strickland") Motion to Suppress. (ECF No. 83.)[1] The United States of America (the "Government") filed an opposition. (ECF No. 88.) On August 30, 2023, the Court held *Frye* and *Wade* hearings. (ECF No. 114.) On September 29, 2023, at the Court's request, the Government and Strickland each filed supplemental briefs. (ECF Nos. 117, 118.) Having reviewed the parties' submissions filed in connection with the Motion, for the reasons set forth below and for good cause having been shown, Strickland's Motion is **DENIED**.

---

[1] This motion was part of a larger omnibus motion. (ECF No. 83.) On February 27, 2023, the Court held a hearing on the omnibus motion (ECF No. 105), and on February 28, 2023, entered an order granting Strickland's request for an evidentiary hearing to determine the admissibility of identification evidence and denying the rest of the motion (ECF No. 106). (*See* ECF No. 107, Tr. 38:9–10, 39:2–4 (granting a hearing limited to the suggestive nature of the photo presented to the officer).) A *Wade* hearing was set for April 19, 2023, and following counsel's requests to adjourn, the hearing took place on August 30, 2023. (ECF No. 113.)

I.  **BACKGROUND**

A.  **Factual Background**

Strickland seeks to suppress identification evidence made by an undercover officer, Det. Cooney, an undercover officer, alleging the identification procedure was impermissibly suggestive and unreliable. (ECF No. 118 at 21.)

Law enforcement began investigating Strickland in 2019 while pursuing a drug trafficking organization ("DTO"). (ECF No. 88 at 1.) Beginning in November 2019, Det. Cooney allegedly purchased narcotics (heroin) from Strickland in and around North Brunswick, New Jersey. (*Id*. at 1–2.) Specifically, on November 22, 2019, the Government provided a photograph to Det. Cooney of Strickland (ECF No. 118, Ex. G-1) to use for identification in the initial purchase. (*Id*. at 2.) In bringing charges, law enforcement relied on further undercover purchases, in addition to pen register and trap and trace devices, a wiretap of Strickland's phone, and establishment of surveillance of a Paterson location to continue their investigation of the DTO, ultimately charging twelve defendants with narcotics offenses, including Strickland. (*Id.* at 2–3.)

Prior to the November 22, 2019 transaction, Det. Cooney was briefed by the case agent about the Strickland, who provided him with a mugshot of Strickland along with his "age, date of birth, where he was living, where he was believed to be living, and just his background, in general." (Tr. 14:1–5.) Det. Cooney was undercover for more than one investigation at the time. (Tr. 13:9–14.) After receiving Strickland's contact information from the informant, Det. Cooney arranged the transaction via telephone. (Tr. 14:19–15:7.) At the site of the transaction, there were surveillance vehicles for safety and observance (Tr. 16:3–10), and the vendor arrived with an unidentified person who remained outside of the vehicle when the transaction occurred (Tr. 50:19–

20). Det. Cooney testified he was in a parked car with Strickland for "five to ten minutes." (Tr. 17:8.)

Within an hour after the transaction, Det. Cooney made a positive identification of Strickland using a photograph taken from the MVC. (Tr. 20:13–19; ECF No. 118 at 2.) In the photograph, Strickland does not have facial hair. (ECF No. 118, Ex. G-1.) On December 2, 2019, Det. Cooney filed a report describing the vendor as a "black male, 53 years of age, with a large build, having a light brown complexion, shaved head and clean shaven. The vendor was wearing a black beanie, black jacket, black pants, and white shoes." (*Id.*, Ex. D-1 at 2.) Additionally, Det. Cooney testified that the vendor's "eyes, his nose, his lips, just his facial structure, where his cheekbones are" were consistent with the photograph he was given to confirm the vendor's identity. (Tr. 20:6–12.) Det. Cooney was therefore "extremely confident" in his confirmation of the vendor's identity. (Tr. 20:20–21:2.) Further, Det. Cooney explained that this identification was not only confirming the person under investigation, but the vendor he observed during the transaction. (Tr. 20:13–17.)

**B.      Procedural Background**

On July 14, 2020, a Complaint (ECF No. 1) was filed against Strickland and four other defendants, and Strickland was subsequently arrested the following day (ECF No. 15). On April 14, 2021, Strickland was indicted for narcotics conspiracy, in violation of 21 U.S.C. § 846 (Count One), and possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B) (Count Two). (ECF No. 50.) On October 14, 2022, Strickland filed an Omnibus Motion[2], which included the pending Motion to Suppress. (ECF No. 83.) On

---

[2] *See supra* n.1.

November 9, 2022, the Government filed an Opposition. (ECF No. 88.) On February 28, 2023, this Court granted Strickland's request for *Wade* hearing to determine the admissibility of identification evidence. (ECF No. 106.) On August 30, 2023, the Court held the *Wade* hearing regarding the identification evidence. (ECF No. 113.) Following the *Wade* hearing, the parties filed supplemental briefs at the Court's request. (ECF Nos. 117 & 118.)

During the *Wade* hearing, each party brought in an expert witness to testify about the identification. The Government brought in Det. Cooney, the undercover officer assigned to the investigation. Strickland brought in Dr. Rotello, an expert witness in memory and identification. The Government's arguments rest on reliability of the identification rather than its suggestiveness, arguing that the identification's reliability outweighs the procedure's alleged suggestiveness. (ECF No. 117 at 4.)

During testimony, Det. Cooney described himself as a person of Irish, German, and Puerto Rican descent. (Tr. 50:19–20.) He further explained he has nine years of police work, which involved making positive identifications. (Tr. 9:14–21.) Additionally, Det. Cooney testified he has experience making positive identifications during two overseas military deployments. (Tr. 10:19–11:1.)

Strickland contends Dr. Rotello's testimony supports his argument that Det. Cooney's identification was both impermissibly suggestive and unreliable. (ECF No. 118 at 9–11.) First, Dr. Rotello highlighted the interaction between Det. Cooney and the vendor was interracial, and that such identifications are 50% less accurate than intraracial identifications. (Tr. 63:3–16.) During the transaction, the vendor was reported to have been wearing a "black beanie cap" (ECF No. 118, Ex. D-1A), which Dr. Rotello considers a "partial disguise" that can contribute to false identification "by about 50%" (*Id.*, Ex. D-2 at 23 ¶ 69(a)). Further, Dr. Rotello found it

4

"implausible" that the transaction lasted five to ten minutes as Det. Cooney testified, and that people "tend to overestimate . . . the length of time that something takes." (Tr. 80:5–18.) Dr. Rotello also testified that research does not support the claim or belief that police officers are more reliable than standard witnesses, and stressful situations negatively impact a witness's ability to make identifications. (Tr. 69:2–70:14.)

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 41(h) provides "[a] defendant may move to suppress evidence in the court where trial will occur, as Rule 12 provides." Fed. R. Crim. P. 41(h). Rule 12 requires suppression motions be made prior to trial. Fed. R. Crim. P. 12(b)(3)(C).

A criminal defendant has the constitutional right to a fair trial "at which the witnesses against [them] might be meaningfully cross-examined." *United States v. Wade*, 388 U.S. 218, 223–24 (1967). This right is to be protected from the "annals of criminal law" that are "rife with instances of mistaken identification." *Id.* at 228. The Court in *Wade* wanted to protect a criminal defendant's ability to meaningfully attack the identification witness's credibility at trial. *Id.* at 231–32. Suggestive procedures, such as members of a lineup being grossly dissimilar in appearance to the defendant or an identifying appearance singling out the defendant in a lineup, may jeopardize a fair trial because a defendant's possible conviction may be determined by such pre-trial confrontations rather than by what occurs during trial. *Id.* at 232–35.

A suggestive identification procedure alone is not sufficient to determine the identification's admissibility. To determine whether identification is admissible, the Court must analyze: (1) whether law enforcement "used an impermissibly suggestive procedure in obtaining the out-of-court identification"; and, if so, (2) whether the totality of the circumstances supports a "substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 107

(1977). In other words, the Court must determine whether the identification was suggestive, and, if so, whether the identification was nonetheless reliable.

In determining whether, under the totality of the circumstances, the identification was reliable, the Court must consider: (1) the opportunity of the witness to view the defendant; (2) the witness's degree of attention; (3) the accuracy of the witness's description; (4) the witness's level of certainty at the time of identification; and (5) the length of time between the crime and the confrontation. *Id*. at 114. These factors are weighed against the "corrupting effect of the suggestive identification itself." *Id*. Ultimately, "reliability is the linchpin in determining the admissibility of identification testimony." *Id*. *See United States v. Hall*, 28 F.4th 445, 454 (3d Cir. 2022) ("[D]ue process requires the suppression of an identification only if it was obtained pursuant to a suggestive process that in turn raises serious questions about the reliability of the resulting identification."). Where evidence is found to be reliable, even if "unnecessarily suggestive," weaknesses in the evidence "go to weight rather than admissibility." *United States v. Scott*, 816 F. App'x 732, 739 (3d Cir. 2020).

### III.   DECISION

Strickland argues the use of a single photograph to make an identification, and the lack of a photo array or line-up, was impermissibly suggestive in violation of his due process rights. (ECF No. 118 at 2–4.) Further, Strickland argues the suggestive identification does not overcome its facial reliability, and therefore should be suppressed. (*Id*. at 4.) The Government argues the single-photograph procedure was not about "identifying a 'suspect,'" rather, it was about "confirming the identification of a person" who was under investigation with the DTO. (ECF No. 117 at 1.) Additionally, the Government asserts the identification's reliability supersedes any suggestiveness and should therefore be admissible. (*Id*.)

In *Brathwaite*, the identification was based on a single photograph. 432 U.S. at 103–04. The Court found that "identifications arising from single-photograph displays may be viewed in general with suspicion," but the factors suggested that the undercover agent's "ability to make an accurate identification [was] hardly outweighed by the corrupting effect of the challenged identification itself." *Id*. at 116. Accordingly, the Court will, first, analyze the *Brathwaite* factors to determine reliability and, second, weigh it against the alleged suggestiveness of the identification procedure under the totality of the circumstances in this case.

A. **The *Brathwaite* Factors**

1. **Opportunity to View**

The first factor to consider in determining reliability is "the opportunity to view the criminal at the time of the crime." *Brathwaite*, 432 U.S. at 114. In *Brathwaite*, the undercover agent stood at an apartment door within two feet of the defendant and looked directly at the defendant in natural lighting. *Id*. The defendant answered the door with a woman behind him, and shortly thereafter, the door closed while the defendant retrieved the drugs. *Id.* at 100. The defendant returned with the drugs, and the undercover resumed face-to-face contact. *Id.* The entire transaction from the first opening of the door to the second closing of the door lasted from five to seven minutes. *Id.*

Strickland asserts Det. Cooney did not have a sufficient opportunity to view the vendor during the alleged transaction. (ECF No. 118 at 12.) Specifically, Strickland argues Det. Cooney did not have a direct, face-on view of the vendor due to their respective positions in the car. (*Id*.) By viewing the vendor at an angle and not directly, Strickland argues this would have increased the likelihood of misidentification when comparing what Det. Cooney observed to the face-on perspective in the photograph. (*Id*. at 14.) Additionally, Strickland argues the circumstances

7

regarding the transaction, such as Det. Cooney's mental state and distractions via counting money, his reviewing the drugs, and the presence of another individual outside of the vehicle, compromised his ability to observe the vendor by dividing his attention. (*Id*.) Strickland further asserts the duration of the interaction is inconsistently alleged through Det. Cooney's testimony, his report, and the Surveillance Team's report. (*Id*. at 12–13.)[3] Dr. Rotello's testimony supports Strickland's argument by suggesting the duration of the transaction may have been overestimated (Tr. 80:5–18), and the vendor wearing a beanie cap was a "partial disguise" that can contribute to false identification (Ex. D-2 at 23 ¶ 69(a)).

The Government argues Det. Cooney had sufficient opportunity to view Strickland during the initial transaction. Det. Cooney testified he was in a parked car with Strickland for "five to ten minutes." (Tr. 17:8.) During this interaction, Det. Cooney made "face-to-face eye contact" with Strickland, and that they "faced each other" while they spoke. (Tr. 16:22.) Det. Cooney also testified there was nothing obstructing his view of Strickland and the transaction occurred during daylight hours. (Tr. 17:19–18:5.) Although Det. Cooney said he was nervous during his first encounter with Strickland, Det. Cooney testified that he was able to accurately perform his work and focus on making the identification. (Tr. 18:24–19:8.)

The Court finds that Det. Cooney had a sufficient opportunity to view Strickland[4] during the transaction. Det. Cooney's testimony, along with his report and the Surveillance Team's report,

---

[3] Det. Cooney testified that the transaction took between 5-10 minutes. (Tr. 17:5–8.) Det. Cooney's report does not include the duration of the transaction. (Ex. D-1.) The Surveillance Team's report uses the term "shortly thereafter" regarding the time Strickland entered the vehicle and subsequently exiting the vehicle. (Ex. D-1A at 1.)

[4] While this Court uses "Strickland" to refer to the vendor of the transaction at issue, the Court does not use this label as a determination of whether Strickland was actually the vendor. Rather, the use of Strickland's name is to provide consistency when referring to this case.

suggest that the transaction lasted between five and ten minutes and was unobstructed. While Strickland arrived with another individual, the facts are similar to *Brathwaite* where the Court found that the presence of another individual did not infringe upon the undercover's opportunity to view the defendant.

    **2.    The Degree of Attention**

The second factor to consider in determining reliability is the witness's degree of attention at the time of the crime. *Brathwaite*, 432 U.S. at 114. In *Brathwaite*, the witness was a specialized undercover police officer trained to "pay scrupulous attention to detail," knowing that the observations claimed would later be subject to "close scrutiny and examination" during a trial. *Id*. at 115. The undercover was the same race as the defendant. *Id*. At the time of the transaction, the undercover did not know the identity of the defendant. *Id*. at 101. In weighing the degree of attention in the totality of the circumstances, the Court emphasized that the witness was specially trained. *Id*. at 115.

Strickland argues Det. Cooney did not have a sufficient degree of attention while identifying the vendor. (ECF No. 118 at 13.) Specifically, Strickland emphasizes the transaction as a cross-racial identification and the negative impact such identifications have on accuracy. (*Id*.) Additionally, Strickland reasserts that Det. Cooney did not observe the vendor face-on, and his attention was divided during the transaction by another person's presence outside of the vehicle (Tr. 15:19–23) and looking away to count the money and check the drugs (Tr. 29:14–18). In Det. Cooney's report, he wrote that the vendor was wearing a beanie and had a shaved head (Ex. D-1 at 2), but testified that he did not recall whether the vendor had removed the beanie during the interaction or what compelled him to write that description (Tr. 40:2–4). Finally, Det. Cooney testified the investigation on the vendor "wasn't the only investigation [he] was undercover on

9

during this time" (Tr. 13:9–14), which Strickland considers to further increase chances of false identification. (ECF No. 118 at 14.)

The Government argues Det. Cooney's ability to perform his job with a sufficient degree of attention is similar to the undercover in *Brathwaite*. (ECF No. 117 at 3.) Specifically, Det. Cooney testified he had nine years of police work, including the duty of making positive identifications. (Tr. 9:14–21.) Det. Cooney had further experience of making positive identifications during two overseas military deployments. (Tr. 10:19–11:1.) The report Det. Cooney filed on December 2, 2019, describes Strickland as a "black male, 53 years of age, with a large build, having a light brown complexion, shaved head and clean shaven. Strickland was wearing a black beanie, black jacket, black pants, and white shoes." (Ex. D-1 at 2.) The photograph provided to Det. Cooney to make the identification displays Strickland with a moustache. (Ex. G-1.) Det. Cooney was also shown a photograph of Strickland prior to the transaction. (Tr. 14:16–18.) Furthermore, Det. Cooney testified that Strickland's "eyes, his nose, his lips, just his facial structure, where his cheekbones are" were consistent with the photograph he was given to confirm Strickland's identity. (Tr. 20:6–12.)

The Court finds that Det. Cooney's degree of attention was sufficient to make an identification. Both Det. Cooney's testimony and the descriptions written in his report and the Surveillance Team's report include details similar to those from *Brathwaite*. Det. Cooney, like the undercover in *Brathwaite*, was specially trained and had years of experience performing identifications. While the Court recognizes the impacts of cross-racial identification[5] and other

---

[5] *See* REPORT: 2019 REPORT OF THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT TASK FORCE ON EYEWITNESS IDENTIFICATIONS, 92 Temp. L. Rev. 1, 82–84 (discussing cross-racial impacts on identification).

concerns Strickland raises, the Court must weigh such considerations under the totality of the circumstances.

        **3.**      **Accuracy of the Description**

The third factor to consider in determining reliability is the "accuracy of [the witness's] prior description of the criminal." *Brathwaite*, 432 U.S. at 114. In *Brathwaite*, the undercover provided a description within minutes of the transaction. *Id.* at 115. The description "included the vendor's race, his height, his build, the color and style of his hair, and the high cheekbone facial structure. It also included clothing the vendor wore." *Id*. The undercover made the photograph identification two days later. *Id*. The Court highlighted that no claim was made that the defendant "did not possess the physical characteristics so described." *Id*.

Strickland argues Det. Cooney's description was inaccurate because the report was filed ten days after the transaction. (Tr. 36:22–24.) Further, Det. Cooney's assessment of the vendor's facial features was not reflected in the report. (Tr. 20:8–12; Ex. D-1.) Prior to the transaction, Det. Cooney was briefed by the case agent about the vendor, who provided Det. Cooney with a mugshot, Strickland's "age, date of birth, where he was living, where he was believed to be living, and just his background, in general." (Tr. 14:1–5.) Given the circumstances, Strickland argues Det. Cooney's report reflected the information he was briefed on rather than what he observed during the transaction. (ECF No. 118 at 16.)

The Government argues Det. Cooney's description in his report (Ex. D-1 at 2) was an accurate description, and that he listed similar characteristics as the ones described in *Brathwaite*. (ECF No. 117 at 3.) Additionally, Det. Cooney testified that he relied on several facial features to confirm Strickland's identity, namely his eyes, nose, lips, facial structure, and where his cheekbones are. (Tr. 20:8–12.)

11

The Court finds Det. Cooney's description is sufficiently accurate. Det. Cooney made the identification within an hour of the transaction and provided specific details regarding what he observed. While the report was filed ten days after the transaction, the Surveillance Team's report was filed on November 25, 2020, just three days after the transaction. (Ex. D-1A.) Further, the information in Det. Cooney's report is supported by the description listed in the Surveillance Team's report.

### 4. The Witness's Level of Certainty

The fourth factor to consider in determining reliability is the "level of certainty demonstrated at the confrontation." *Brathwaite*, 432 U.S. at 114. In *Brathwaite*, it was not disputed that the photograph used for identification was of the defendant. *Id*. at 115. The undercover testified there was "no question whatsoever" that the person in the photograph was the vendor. *Id*. The Court noted that the undercover's "positive assurance was repeated." *Id*.

Strickland disputes Det. Cooney's certainty and emphasizes other portions of his testimony to argue that he couldn't have been certain about his identification. (ECF No. 118 at 16–17.) Specifically, Strickland points to Det. Cooney's testimony that he could not recall whether the vendor removed the beanie from his head (Tr. 39:24–40:4), "exactly how long" the transaction took (Tr. 28:14–24), and that he was working on multiple investigations during that time (Tr. 37:10–16).

The Government argues Det. Cooney's certainty was sufficient. (ECF No. 117 at 3.) Specifically, the Government emphasizes Det. Cooney's testimony, where he stated that he was "extremely confident" in his confirmation of the vendor's identity. (Tr. 20:20–21:2.) Further, Det. Cooney explained that this identification was not only confirming the person under investigation, but the vendor he observed during the transaction. (Tr. 20:13–17.)

12

The Court finds that Det. Cooney's level of certainty is sufficient. Det. Cooney's testimony and report do not indicate a lack of certainty in his identification of Strickland. Strickland's argument regarding Det. Cooney's testimony on August 30, 2023, and his inability to recall events from the transaction in November 2019 does not undermine Det. Cooney's level of certainty when he made the identification and subsequently wrote the report.

### 5. Time between the Crime and Confirmation

The fifth and final factor to consider in determining reliability is the amount of "time between the crime and the confrontation." *Brathwaite*, 432 U.S. at 114. In *Brathwaite*, the undercover's description of the vendor was given within minutes of the transaction. *Id*. at 115–16. Two days later, the undercover viewed the photograph and made the identification. *Id*. at 116. The Court noted that there was not a "passage of weeks or months between the crime and the viewing of the photograph." *Id*.

Strickland argues Det. Cooney's report was filed ten days after the transaction. (ECF No. 118 at 17.) Det. Cooney testified the report "was written after [he] confirmed and signed that piece of paper." (Tr. 36:15–18.) The Government points out, however, that the time between the crime and identification was sufficient to be reliable. (ECF No. 117 at 3.) Det. Cooney testified that he viewed the photograph and made the identification within an hour of the transaction. (Tr. 20:13–19.)

The Court finds the time between the crime and identification was sufficient to satisfy *Brathwaite*. Det. Cooney made the identification within an hour of the transaction, an even shorter time frame than what the Court found sufficient in *Brathwaite*. The report was subsequently filed after the identification was confirmed.

### B. Balancing Suggestiveness and the *Brathwaite* Factors

The *Brathwaite* Court held that the totality of circumstances did not create "a very substantial likelihood of irreparable misidentification" despite the use of a single photograph. 432 U.S. at 116 (quoting *Simmons v. United States*, 390 U.S. 377 at 384 (1968)). The Third Circuit has applied this test on a case-by-case basis.[6]

Strickland argues Det. Cooney's briefing on the vendor prior to the transaction committed Det. Cooney's identity of the vendor as Strickland, and the transaction would have furthered that confirmation bias. (Tr. 93:2–25.) Det. Cooney testified he was briefed because "[they] have to build some sort of intelligence before [they] go out into the field and deal with someone . . . [they] don't just go out there blind." (Tr. 14:6–11.)

The Government asserts Det. Cooney's reliability is further evidenced by subsequent transactions between him and Strickland. (ECF No. 117 at 4.) Det. Cooney testified there were fifteen subsequent interactions where he felt confident that his identification of Strickland was certain. (Tr. 24:3–25.) The Government also argues, referencing dicta from *Brathwaite*, that Strickland has not provided evidence to undermine the identification. (ECF No. 117 at 4 (citing to *Brathwaite*, 432 U.S. at 116).)

The Court holds that Det. Cooney's testimony to be credible,[7] identification is reliable, and, when balanced against the suggestiveness, is admissible. First, Det. Cooney had sufficient

---

[6] *Compare Scott*, 816 F. App'x at 739 (holding that the totality of circumstances established the identification as reliable, assuming the identification was unnecessarily suggestive), *with Thomas v. Varner*, 428 F.3d 491, 504 (3d Cir. 2005) (holding that the identification was unduly suggestive, and that the totality of circumstances rendered the identification unreliable).

[7] The Court observed Det. Cooney during his testimony, particularly during cross examination, and finds he was engaged, responsive, noncombative, and relaxed. In observing his body language, he showed no evidence of his testimony being fabricated.

opportunity to observe Strickland during the transaction because of the duration of the interaction and the lack of obstruction to his view. Second, Det. Cooney's testimony and report support his accuracy in describing and identifying Strickland from that initial transaction. Third, both Det. Cooney's testimony and report support an accurate description of Strickland by discussing physical features and the clothing he was wearing at the time of the transaction. Fourth, Det. Cooney expressed confidence in his identification when the identification was made. Fifth and finally, Det. Cooney made the identification within an hour of the transaction, which is a relatively short period of time.

The Court concludes that any shortcomings to the identification procedure, including alleged suggestiveness, "go more to the weight of the evidence than the reliability of [the witness's] identification[], and thus [are] issues for the jury." *United States v. Brownlee*, 454 F.3d 131, 140 (3d Cir. 2006). Therefore, the evidence is nonetheless admissible, and the Motion is **DENIED**.

### IV.  CONCLUSION

For the reasons set forth above, Strickland's Motion to Suppress is **DENIED**. An appropriate order follows.

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
UNITED STATES DISTRICT JUDGE

Dated: November 28, 2023